UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRISTEN MERCEDES POINDEXTER, | ) ) | CIVIL ACTION NO. 1:21-CV-1847 |
| Plaintiff | ) ) | |
| v. | ) ) | (ARBUCKLE, M.J.) |
| STARBUCKS YORK ROASTING PLANT, | ) ) ) | |
| Defendant | ) | |

**<u>MEMORANDUM OPINION</u>**

## I.   INTRODUCTION

Tristen Mercedes Poindexter ("Plaintiff") initiated this employment discrimination action alleging that her former employer, Starbucks Roasting Plant, engaged in race-based discrimination in violation of Title VII. This matter is before us upon consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.

Currently before the Court is Defendant's Motion requesting that Plaintiff's Second Amended Complaint be dismissed for failure to state a claim. (Doc. 34). For the reasons explained herein, Defendant's Motion will be granted, and Plaintiff's second amended complaint will be dismissed without further leave to amend.

## II.      BACKGROUND AND PROCEDURAL HISTORY

Plaintiff worked as an Inventory Control Specialist at a Starbucks Roasting Plant from May 13, 2019, until she was terminated on May 13, 2022. (Doc. 31, p. 1). Plaintiff alleges she was the only African American Inventory Control Specialist. *Id.* During her employment, Plaintiff believes she was discriminated against, and fired in retaliation for reporting that discrimination. Plaintiff's claims concern a series of separate incidents. As written, Plaintiff's Second Amended Complaint discusses her grievances in a disorganized fashion. We endeavored to categorize those grievances and will discuss each category separately below, and then will summarize the procedural history of this case.

### A.      ALLEGATIONS REGARDING MR. SUTTON'S DISREGARD FOR CONFIDENTIAL INFORMATION ABOUT PLAINTIFF

Throughout her Second Amended Complaint, Plaintiff alleges that her supervisor, Andrew Sutton, exhibited a disregard for Plaintiff's private information. To support her claim, Plaintiff cites two examples. First, Plaintiff asserts that Mr. Sutton did not keep her time sheets in a secure location. She reports Mr. Sutton was offended when she asked him to do so. Second, she asserts that Mr. Sutton sent or handed Plaintiff's ZIP card to a co-worker. Plaintiff asserts that this conduct violated company policy and that it was discriminatory because Plaintiff "was the only African American Inventory Control Specialist" Defendant employed. (Doc. 31, p. 1).

Regarding Plaintiff's timesheets, we infer that at the Starbucks Roasting Plant, there is a time clock system that requires each employee to clock themselves in and out. At the end of each week employees are required to review a time detail to confirm their hours were entered correctly. Plaintiff alleges that Mr. Sutton would leave employees' timesheets in one or two central locations each week for employees to pick up and review. Plaintiff objected to this practice and did not feel comfortable having her timesheet left where others could view it.

On April 2, 2020, Plaintiff emailed Mr. Sutton and expressed privacy concerns about this practice. (Doc. 31, p. 4, ¶ 1). Plaintiff alleges she proposed several solutions, including "for plaintiff to receive the plaintiff's confidential information either a secured email or the plaintiff come to the plaintiffs former Supervisor personally and retrieve such information." *Id.* Once asked, it appears that Mr. Sutton no longer left Plaintiff's timesheet in a location where others could see it. (Doc. 31, p. 4, ¶¶ 1-2). However, he frequently forgot to notify Plaintiff that her timesheet was available to pick up. On one occasion, when Plaintiff stopped by Mr. Sutton's office to retrieve her timesheet, Mr. Sutton commented that Plaintiff wanted special treatment. (Doc. 31, p. 1, § I ¶ 3). Plaintiff perceived Mr. Sutton's forgetfulness and his comment as race-based discrimination.

Plaintiff alleges that all employees were issued individual "ZIP cards." She explains that these ZIP cards were a confidential way for employees "to report positive and negative practices" at the job site to their supervisors. (Doc. 31, p. 4, ¶ 3).

On March 18, 2021, Plaintiff handed her ZIP card to Mr. Sutton. *Id.* Approximately thirty minutes later, Mr. Sutton either handed or emailed Plaintiff's ZIP card to one of Plaintiff's co-workers, TishaLiz Reyes-Pinedo. (Doc. 31, p. 4, ¶ 4). Plaintiff perceived this breach of her privacy as an "intentional" act by Mr. Sutton. Plaintiff alleges she reported this issue to Mr. Sutton's supervisor (Nicole McCleary). (Doc. 31, p. 4, ¶ 1). Plaintiff viewed this incident as race-based discrimination.

### B. MR. SUTTON'S FAILURE TO FOLLOW COMPANY POLICY REQUIRING ACKNOWLEDGEMENT AND VERIFICATION OF TIMESHEETS

Plaintiff alleges that Defendant has a policy that requires all employees to sign a form each week acknowledging that they reviewed and verified the hours reported on their timesheets. (Doc. 31, p. 2, ¶ 6). Plaintiff alleges that Mr. Sutton left the timesheets out for employees to review and sign. He apparently did not require employees to sign a separate form acknowledging receipt and verifying hours worked.

On December 28, 2020, Mr. Sutton:

> Sent an email out to all of the Inventory Control Department and labeled the email "Time detail acknowledgement". In the email [Mr. Sutton' stated that it has become a requirement that partners acknowledge that they received their time details instead returning the time details back to [Mr. Sutton].

*Id.* Plaintiff was offended by Mr. Sutton's decision to frame this as a "new requirement" when it was always the policy. Plaintiff viewed this incident as race-based discrimination.

### C.    TIMESHEET ADJUSTMENTS

Plaintiff alleges that her timesheet was incorrectly adjusted twice, and no one explained how or why that occurred.

On November 11, 2020, Plaintiff alleges her timesheet showed she worked 2.24 hours, when she worked almost nine hours. (Doc. 31, p. 2, ¶ 5). On January 11, 2021, Plaintiff alleges that her timesheet showed that she worked eight hours, when she worked ten hours. (Doc. 31, p. 2, ¶ 7). Plaintiff reported these incidents to both Mr. Sutton and Ms. McCleary via email and telephone. (Doc. 31, pp. 2, 4). She requested an explanation for the errors but does not allege whether an explanation was provided.

On January 12, 2021, Plaintiff contacted the Starbucks Roasting Plant's ethics hotline. (Doc. 31, p. 4, ¶ 2). Various partner resource employees followed-up with Plaintiff regarding the timesheet issue via email and telephone. (Doc. 31, p. 5, ¶¶ 3-6).

On April 29, 2021, Plaintiff met with Crystal Mayers, a Partner Resource Associate. (Doc. 31, p. 2-3, ¶¶ 1-2). Ms. Mayers advised Plaintiff that a review of Plaintiff's timesheets for the period from May 1, 2020, through January 17, 2021, revealed that 3.45 hours of time was not accurately credited. *Id.* Ms. Mayers informed Plaintiff that a check for the discrepancy would be deposited into Plaintiff's account. *Id.* Plaintiff references the following letter from Ms. Mayers in her Second Amended Complaint:

> As a result of a recent payroll audit that spanned from May 1, 2020 through January 17, 2021, we've determined that some partner timecards were adjusted incorrectly, resulting in a small loss of hours for a few partners. Based on this audit, 3.45 hours of pay which totaled $107.11 was processed. However, due to various deductions your net payment is $81.73. A copy of the off cycle pay statement is attached for your records.

(Doc. 20-7, p. 62).[1]

Plaintiff viewed the time adjustment errors as race-based discrimination.

---

[1] In the "Gross Negligence" section of the Second Amended Complaint, Plaintiff also references an email sent by Tracy Ellison to follow up with Plaintiff about additional reports. (Doc. 31, p. 3, ¶ 3). Those "additional reports" from May 4, 2021 appear to concern the ZIP card incident. (Doc. 20-4, p. 57) (May 5, 2021 email from Plaintiff to herself noting that she reported the ZIP card incident to Ms. McLeary on May 4, 2021). Ultimately, Plaintiff declined to meet with Tracy Ellison to discuss any of her reports. (Doc. 20-3, p. 5) (May 8, 2021 email from Plaintiff to Tracy Ellison declining to meet about Plaintiff's concerns); *see also* (Doc. 20-3, pp. 12-13).

### D.    CONFLICTS WITH JULIE RUPPERT AND CHRIS ROUPAS

We infer that the inventory control employees are required to complete a "past pull" report. Plaintiff alleges that she trained a third shift Inventory Control Specialist named Julie Ruppert to complete past pull reports on May 26, 2021. (Doc. 31, p. 3, ¶ 1).

On June 14, 2021, Ms. Ruppert sent Plaintiff a message requesting that Plaintiff complete the past pull report for the third shift. (Doc. 31, p. 3, ¶ 2). The second amended complaint does not indicate how or whether Plaintiff responded to the request.[2] Later that evening, however, Ms. Ruppert approached Plaintiff at

---

[2] The exhibits Plaintiff references in her second amended complaint include a saved Microsoft Teams conversation between Plaintiff and Ms. Ruppert from June 14, 2021. That conversation has been reproduced below:

[Julie Ruppert 6/14 10:26 PM]: since you guys aren't working on that inventory project anymore, are you going to do the pull report now?

[Plaintiff 6/14 10:38 PM]: No I was not planning on it . . . Are you asking me to help you with it?

[Plaintiff 6/14 10:56 PM]: Hello Julie I did not appreciate the way you just approached me about the Past Pull. It was not what you said but it was how you said it. Andrew [Sutton] was the one who directed you to do the past pull report I had nothing to do with Andrew [Sutton] directing you to handle the past pull job task. If you have a concern with doing the past pull then please address that concern with Management.
What you just did was unnecessary and uncalled for and I really felt disrespected by how you approached me. I have never talked to you in the manner that you just did tonight. Moving forward please address me in the same manner as you would address one of your other colleagues. Thank you.

Plaintiff's desk. *Id.* Plaintiff alleges that Ms. Ruppert was aggressive, offensively touched Plaintiff on the shoulder to gain her attention, then began aggressively pointing in Plaintiff's face while ordering Plaintiff to complete the third shift's past pull report. *Id.* Plaintiff sent Ms. Ruppert a message advising her that Plaintiff felt her conduct was "unprofessional." *Id.* Plaintiff alleges that Ms. Ruppert would not have treated any of her other teammates that way. *Id.* Plaintiff reported the incident to Mr. Sutton but rescinded that report the next day because Ms. Ruppert confronted Plaintiff again and told Plaintiff that "all the plaintiff does is tell on people and that the plaintiff is a little girl for reporting the incident." (Doc. 31, p. 3, ¶ 3).

---

[Julie Ruppert 6/14 11:29 PM]: sorry. i thought i walk [sic] talking to the group. Initially i know you , leroy and Jeanne were asked to do it . I wasn't trying to boss anyone around or be mean about it.

I knew he wanted me to do past pull on a temporary basis. i didn't think it was supposed to be permanent[.]

[Plaintiff 6/15 12:23 AM]: Julie we can assist each other. If you need help with something and I am here I will be more then happy to help you but you have to speak up and tell someone that you need to help because if you don't then no one is going to know. I accept your apology and we can move forward[.]

[Julie Ruppert 6/15 12:30 AM]: ok. Thanks[.]

(Doc. 20-2, pp. 91-92) (errors in original).

Plaintiff also submitted a copy of her email to Mr. Sutton regarding the incident. (Doc. 20-3, p. 54). On June 15, 2021 at 12:40 AM Plaintiff emailed Mr. Sutton requesting that he disregard her email. She said that Julie apologized and that they came to a better understanding. (Doc. 20-3 p. 69). Mr. Sutton responded by thanking Plaintiff. (Doc. 20-3, p. 68).

On July 3, 2021, Plaintiff noticed that she was being followed by a Manual 2 Supervisor named Chris Roupas. (Doc. 31, pp. 3-4, ¶ 4).[3] Plaintiff reported the incident to Mr. Sutton, but no action was taken. *Id.*

---

[3] The record in this case includes a email from Plaintiff addressed to herself describing the incident. That email states:

> On July 3rd 2021 at 1:45 in the morning I was approached by Company Owned Supervisor Chris Roupas while I was at the IC corral sorting pallets. While sorting pallets with my coworker Tisha Reyes, Chris Roupas drove up on a golf cart looking for my coworker Leroy Wentz. I told Chris that Leroy was off until Monday. Chris Roupas told me that there was a location that had a pallet that needed fixed at 274-110-5. I told Chris that my shift was getting ready to be over but I would fix the pallet but I needed to go to the front to retrieve my harness and cherry picker. As I walked to the front to retrieve my harness and cherry picker with my coworker Tisha, I was followed by Chris Roupas. Chris acted like he went to the main office in the front but he instead waited for me to get onto my cherry picker. After I got on my cherry picker and began to drive to location 274-110-5 Chris Roupas followed me on the opposite side of where was driving once I got to the location Chris stayed and watched me from afar while I fixed the pallet that had 1 case sticking out. Once I came down from the location, my coworker Tisha was standing at the end of the aisle at 274-070-1 and Chris was at the beginning of the aisle at 274-00101. I asked Chris Roupas why he was following me and that it is against Starbucks policy to micro manage employees and I did not appreciate him doing that to me. Chris laughed at my statement and said "Thanks for being a good little girl by doing my job". He then called Manager Justin Adams on the telephone and stated that "The little girl did a wonderful job fixing the pallet and that we (my coworker Tisha Reyes and I) were holding him hostage so he had to let us leave". I told Justin that I did not think that was appropriate comment to state due to that being a lie. Justin stated that it was a job and that Tisha and I may leave for the rest of the day. On July 6th 2021 I went to my Supervisor Andrew Sutton at 7:15 a.m. and reported verbally what had taken place with Chris Roupas and he also confirmed with my coworker Tisha.

Plaintiff suggests that these two incidents for the basis of a race-based hostile work environment claim.

### E.   RETALIATORY TERMINATION

Plaintiff alleges that she reported Mr. Sutton's conduct to Nicole McCleary, and to an ethics hotline. (Doc. 31, pp. 4-5, ¶¶ 1-7). The Second Amended Complaint suggests that both Ms. McCleary and "Partner Resource" employees followed-up on those complaints. The last contact about these issues mentioned in the Second Amended Complaint is an email exchanged with the Partner Resource employee on May 7, 2021. *Id.* Plaintiff suggests that her termination, almost one year later for "walking while completing inventory cycle counts" was related to her complaints about Mr. Sutton. *Id.* She also alleges in her closing that she was "terminated after legal documents were filed" against Defendant. (Doc. 31, p. 5).

### F.   PROCEDURAL HISTORY

On November 1, 2021, Plaintiff filed a two-page complaint in federal court using a pre-printed form. (Doc. 1). Along with that complaint, Plaintiff paid the required civil filing fee.

In her Complaint, Plaintiff indicated that she wished to file a claim under Title VII for discrimination. (Doc. 1, p. 1). Defendant filed a motion to dismiss Plaintiff's Complaint, which was granted. (Docs. 15, 16, 20, 21, 23, 24). Plaintiff

---

(Doc. 20-3, p. 79) (errors in original).

was given leave to file an amended complaint on or before February 6, 2023. (Doc. 24).

On February 7, 2023, the Court received Plaintiff's Amended Complaint. (Doc. 26). Plaintiff's Amended Complaint did not include a case caption, name any defendants, or clearly identify her legal claims. *Id.* The Court deemed the amended complaint as timely filed, but stayed the deadline for Defendant's response and scheduled a telephone conference with all parties to discuss how to proceed. Following that conference, Plaintiff agreed to file a second amended complaint. Plaintiff was advised that her second amended complaint must: include a case caption; be titled as the "Second Amended Complaint"; clearly identify the parties; set forth allegations in short (one sentence) numbered paragraphs; include a detailed fact section; and clearly identify her legal claims. (Doc. 30).

On March 23, 2023, Plaintiff filed her Second Amended Complaint. (Doc. 31). Plaintiff's Second Amended Complaint does not include a caption, does not clearly identify any defendant in the caption or the body of her complaint, and does not clearly identify her legal claims. *Id.* At the conclusion of the document, Plaintiff requests that the Court consider "all of the submitted documentation filed by plaintiff," when reviewing the Second Amended Complaint. *Id.* at p. 6. We infer that Plaintiff refers to the over 500 pages of exhibits Plaintiff attached in response to Defendant's first motion to dismiss. (Docs. 20-1, 20-2, 20-3, 20-4, 20-

5, 20-6, 20-7, 20-8). These exhibits include Plaintiff's EEOC right to sue letter, communications between Plaintiff and her co-workers, and emails Plaintiff sent to herself to memorialize the events underlying her Second Amended Complaint. We will treat these documents as exhibits to Plaintiff's Second Amended Complaint, as Plaintiff intended. Therefore, we may consider these documents without converting Defendant's Motion to Dismiss to a summary judgment motion.

On April 20, 2023, the Starbucks York Roasting Plant ("Defendant") filed its Motion to Dismiss Plaintiff's Second Amended Complaint. (Doc. 34). Along with its Motion, Defendant filed a brief in support. (Doc. 35). On May 8, 2023, Plaintiff filed a brief in opposition. (Doc. 37). On May 22, 2023, Defendant filed a reply. This matter has been fully briefed and is now ready to resolve.

## III.    LEGAL STANDARDS

With the foregoing facts and procedural history in mind, it is helpful to review the legal standard for reviewing motions to dismiss, and the legal standards relevant to the Title VII claims alleged in Plaintiff's Second Amended Complaint.

### A.   MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to seek dismissal for failure to state a claim upon which relief can be granted.[4] Under federal pleading standards, a pleading that states a claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;" (2) "a short and plain statement of the claim showing that the pleader is entitled to relief;" and (3) "a demand for the relief sought, which may include relief in the alternative or different types of relief."[5]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[6] When determining whether this standard is met, the factual allegations contained in the complaint must be accepted as true and must be construed in the light most favorable to the plaintiff. A court's obligation to accept all factual allegations as

---

[4] The party seeking dismissal "bears the burden of showing that no claim has been presented." *Hedges v. U.S.*, 404 F.3d 744, 750 (3d Cir. 2005).

[5] Fed. R. Civ. P. 8(a); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned the-defendant-unlawfully-harmed-me accusation.") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[6] *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

true, however, does not extend to legal conclusions.[7] Similarly, a court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."[8] "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."[9] A court must therefore determine "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[10] "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[11]

When reviewing a complaint under this standard, a court typically proceeds in three steps. First, it takes note of the elements a plaintiff must plead to state a claim.[12] Second, it identifies mere conclusions which are not entitled to the assumption of truth.[13] Third, it determines whether the complaint's factual allegations, taken as true, could plausibly give rise to an entitlement to relief.[14] Furthermore, when ruling on a motion to dismiss under Rule 12(b)(6), "a court

---

[7] *Iqbal*, 556 U.S. at 678 (observing that a court is "not bound to accept as true a legal conclusion couched as a factual allegation.").

[8] *Id.* at 679.

[9] *Id.* at 678-79.

[10] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 (3d Cir. 2002) and citing *Twombly*, 550 U.S. at 563 n.8).

[11] *Iqbal*, 556 U.S. at 679.

[12] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

[13] *Id.*

[14] *Id.*

must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."[15]

### B.   TITLE VII CLAIMS

Title VII prohibits racial discrimination in the workplace.[16] There are several different theories of liability for race-based discrimination under Title VII, including: disparate treatment, disparate impact, and hostile work environment. The evidence required to prevail on a discrimination claim under Title VII is dependent upon the theory of liability, and on the facts of a particular case.[17] Moreover, when evaluating the pleading sufficiency, a complaint need not

---

[15] *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

[16] Section 2000e-2(a) of Title 42 of the United States Code provides that:
It shall be an unlawful employment practice for an employer--
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

[17] *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999) ("We have often remarked that the elements of a prima facie case depend on the facts of the particular case.").

establish a *prima facie* case to survive a motion to dismiss.[18] Instead, the complaint must include "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements."[19]

This case appears to involve discrimination claims brought under disparate treatment and hostile work environment theories. We will limit our discussion to those two theories.

"Disparate treatment occurs where an employer has treated a particular person less favorably than others because of a protected trait."[20] One way to establish a claim of disparate treatment, is for a plaintiff to show that: (1) she is a member of a protected class; (2) she was qualified for the position held; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.[21]

Discrimination also occurs where an employee is subjected to severe and pervasive harassment in the workplace due to a protected characteristic. This is called a "hostile work environment." To prevail on a hostile work environment claim, a plaintiff must show that: (1) she suffered intentional discrimination because of his or her protected class; (2) the discrimination was severe or

---

[18] *Connelly v. Lane Const. Corp*, 809 F.3d 780, 788 (3d Cir. 2016).

[19] *Id.* (internal quotation marks omitted) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)).

[20] *N.A.A.C.P. v. North Hudson Regional Fire & Rescue*, 665 F.3d 464, 482 n.11 (3d Cir. 2011) (cleaned up).

[21] *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and (5) respondeat superior liability exists.[22]

In addition to prohibiting discrimination, Title VII also prohibits retaliation against employees who oppose employment practices that Title VII makes unlawful.[23] To prevail on a retaliation claim, a plaintiff must show that: (1) she engaged in activity protected by Title VII; (2) the employer took adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.[24]

### C.   ADMINISTRATIVE EXHAUSTION OF TITLE VII CLAIMS

To pursue a claim under Title VII, a plaintiff must first exhaust administrative remedies. To exhaust administrative remedies under Title VII, a plaintiff must file an administrative charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged act of discrimination, or within thirty days after receiving notice that the state or local agency terminated its proceedings (whichever is earlier).[25] The EEOC will then investigate the charge and the plaintiff must wait until the EEOC issues a right to

---

[22] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

[23] 42 U.S.C. § 2000e-3.

[24] *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006).

[25] 42 U.S.C. § 2000e-5(e)(1).

sue letter before initiating a private action in the appropriate district court.[26]
Furthermore, "the scope of a resulting civil action in the district court is defined by
the scope of the EEOC investigation which can reasonably be expected to grow out
of the charge of discrimination."[27]

## IV.     DISCUSSION

Having reviewed the relevant legal standards, we will now apply them to
Defendant's arguments. We will begin by discussing what claims Plaintiff intended
to assert in her Second Amended Complaint. We will then address the arguments
relevant to those claims.

### A.     CLAIMS ALLEGED IN PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff's Second Amended Complaint does not include a caption and does
not clearly identify her legal causes of action or any named defendant. As
Defendant notes in its brief, the Second Amended Complaint "meanders from one
grievance to the next" in a disorganized fashion. (Doc. 35, p. 6). Her claims are set
forth under the following headings: discrimination, gross negligence, harassment,
disparate treatment, and wrongful termination. However, these labels are not
especially useful in deciphering Plaintiff's pleading.

Plaintiff's former employer, the Starbucks York Roasting Plant, generously
construes Plaintiff's Second Amended Complaint as alleging claims against it. We

---

[26] *Barzanty v. Verizon Pa., Inc.*, 361 F. App'x 411, 414 (3d Cir. 2010).
[27] *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978).

agree with this interpretation of Plaintiff's Second Amended Complaint and construe it as naming the Starbucks York Roasting Plant as the only Defendant.

Regarding the legal claims asserted, we take note that Plaintiff is proceeding without an attorney in this case, and therefore her pleadings:

> must be held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or the litigant's unfamiliarity with pleading requirements. *Boag v. MacDougall*, 454 U.S. 364 (1982); *U.S. ex rel. Montgomery v. Brierley*, 414 F.2d 552, 555 (3d Cir. 1969) (A "petition prepared by a prisoner . . . may be inartfully drawn and should . . . be read 'with a measure of tolerance'"); *Freeman v. Department of Corrections*, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant. *Gibbs v. Roman*, 116 F.3d 83 (3d Cir. 1997) (*overruled on other grounds*); *see also Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996) (discussing Fed. R. Civ. P. 12(b)(6) standard); *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990) (same).
>
> However, there are limits to the court's procedural flexibility: "pro se litigants still must allege sufficient facts in their complaints to support a claim . . . they cannot flout procedural rules — they must abide by the same rules that apply to all other litigants." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citations omitted).[28]

Overlooking the confusion regarding the labels Plaintiff uses for her claims, we construe the Second Amended Complaint as asserting claims under Title VII

---

[28] *Graham v. Pennsylvania Dep't of Corr.*, No. 21-148, 2022 WL 2874724 at *4 (W.D. Pa. Mar. 21, 2022), *report and recommendation adopted*, 2022 WL 2871331 (W.D. Pa. July 21, 2022).

only.[29] Accordingly, we find that Plaintiff asserts the following legal claims in her

Second Amended Complaint:

> (1)  Title VII Disparate Treatment: Andrew Sutton's disregard for Plaintiff's privacy by leaving Plaintiff's timesheet unattended in "various locations" throughout the plant and by transmitting Plaintiff's private ZIP card to a co-worker.

> (2)  Title VII Disparate Treatment: Andrew Sutton's failure to follow the company policy requiring that all employees sign a paper each week acknowledging that they received a copy of their timesheet to review.

> (3)  Title VII Disparate Treatment: incorrect adjustments made to Plaintiff's timesheet on or around November 11, 2020 and January 11, 2021.

> (4)  Title VII Hostile Work Environment: incidents with two employees—Julie Ruppert and Chris Roupas.

> (5)  Title VII Retaliation: Plaintiff's May 2022 termination after making multiple reports about Andrew Sutton's conduct.

We will begin our analysis by addressing Plaintiff's disparate treatment

claims together, then will address her hostile work environment claim and

retaliatory termination claim. Last, we will discuss whether Plaintiff should be

granted leave to file a third amended complaint.

---

[29] Defendant generously read Plaintiff's second amended complaint as asserting claims of negligence and wrongful discharge. (Doc. 35, p. 6). In her brief in opposition, however, Plaintiff only discusses Title VII. (Doc. 37). Given Plaintiff's response, we construe the allegations in the negligence and wrongful discharge sections of the Second Amended Complaint as claims brought under Title VII that were simply mislabeled due to this pro se litigant's unintentional conflation of two separate legal theories.

### B.    PLAINTIFF'S DISPARATE TREATMENT CLAIMS WILL BE DISMISSED

Throughout her Second Amended Complaint, Plaintiff alleges disparate treatment claims based on Mr. Sutton's disregard for Plaintiff's privacy, Mr. Sutton's failure to follow a company timekeeping policy prior to December 2020, and unexplained (but corrected) adjustments made to her timesheets. Defendant argues that the allegations do not make out a plausible disparate treatment claim because these incidents do not rise to the level of "adverse employment action" and even if they did Plaintiff does not allege enough facts to suggest these actions were taken because of Plaintiff's race. These arguments are persuasive.

Once again, disparate treatment occurs where one employee is treated less favorably than others because of a protected characteristic. Plaintiff suggests she was treated poorly because she was the only African American Inventory Control Specialist. To be actionable under Title VII, that conduct must result in adverse employment action. To be adverse, the employment action must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."[30]

Plaintiff was uncomfortable that Mr. Sutton left timesheets out and felt singled out when Mr. Sutton made a comment that Plaintiff was demanding special treatment. Plaintiff was frustrated when Mr. Sutton announced a "new policy"

---

[30] *Jones v. Southeastern Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)).

requiring signatures to verify the accuracy of timesheets, when in fact he was simply complying with a longstanding policy previously ignored. These allegations, however, do not amount to a plausible disparate treatment claim. Although Plaintiff allegations suggest this conduct made her frustrated and uncomfortable, she does not allege that any of Mr. Sutton's conduct in this regard materially altered the terms, conditions, or privileges of her employment. Although the time reporting mistakes may have initially altered Plaintiff's compensation, Plaintiff suggests those errors were corrected. As such, we are not persuaded that the events Plaintiff sets out in her Second Amended Complaint amount to adverse employment action for the purposes of Title VII. As such, all of Plaintiff's disparate treatment claims will be dismissed.

### C. PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS WILL BE DISMISSED

Plaintiff alleges that she was harassed by two co-workers, with one harassing incident per co-worker. The first incident occurred on June 14, 2021, and involved a disagreement between Plaintiff and another employee about which employee should be responsible for running a daily "past pull" report. The second incident occurred on July 3, 2021, when a male employee followed and "micromanaged" her. Defendant argues that Plaintiff does not allege enough facts to show she was subjected to hostility because of her race, and that the two incidents are not severe or pervasive enough to sustain a plausible hostile work

environment claim. (Doc. 35, p. 22). Plaintiff does not meaningfully respond to this argument.

> For workplace harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "The 'severe or pervasive' standard is disjunctive and so 'a plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions.'" *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 215 n.12 (3d Cir. 2017) (quoting *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010)). Thus, "'some harassment may be severe enough to contaminate an environment even[] if not pervasive; other less objectionable, conduct will contaminate the workplace only if is pervasive.'" *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (quoting *Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006)). But "'isolated incidents (*unless extremely serious*) will not amount to [harassment]." *Id.* (quoting *Jensen*, 435 F.3d at 449 n.3).

> "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank*, 477 U.S. at 65 & 67). The "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. "Although the bar for establishing severe or pervasive discrimination is relatively high, the determination of what constitutes severe or pervasive does not lend itself to a mathematically precise test." *Fedder v. Bloomsburg Univ. of Pennsylvania*, No. 4:23-CV-01678, 2024 WL 580552, at *3 (M.D. Pa. Feb. 13, 2024) (internal quotation marks and citation omitted). Whether an environment is hostile or abusive can be determined only by looking at all the circumstances. *Harris*, 510 U.S. at 23. The circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance." *Id.* "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998)).[31]

We agree with Defendant that Plaintiff does not allege facts to adequately support that the incidents forming the basis of her hostile work environment claim were related to her race. We also agree that these two incidents are neither severe nor pervasive. Plaintiff describes only two unrelated incidents perpetrated by separate individuals. Thus, the harassment she describes is not pervasive. Moreover, the incidents she describes are not severe. In the first incident, involving Ms. Ruppert, Plaintiff describes that she and a co-worker disagreed about who was responsible for a task, after they exchanged messages through Microsoft Teams, the co-worker tapped Plaintiff on the shoulder to gain her attention and discuss the issue in person. Plaintiff does not allege facts that suggest this incident altered the terms or conditions of her employment in any way. In the second incident, involving Mr. Roupas, Plaintiff appears to object to being micromanaged and objects to being referred to as a "little girl." This one-time offhand comment, and one instance of Mr. Roupas "micromanaging" Plaintiff is also not severe. Plaintiff does not allege facts that suggest this incident altered the terms or conditions of her

---

[31] *Trevizo v. Del Toro*, No. 1:23-CV-00508, 2024 WL 1195522, at *5-6 (M.D. Pa. Mar. 20, 2024).

employment in any way. Accordingly, Plaintiff's hostile work environment claims will be dismissed.[32]

### D.   PLAINTIFF'S RETALIATORY TERMINATION CLAIM WAS NOT EXHAUSTED

Plaintiff initiated this action on November 1, 2021. (Doc. 1). Plaintiff was terminated approximately six months after she filed this case.

In her Second Amended Complaint, Plaintiff asserts a Title VII claim related to her May 2022 termination. Plaintiff alleges that "she was in contact with the EEOC and was provided with **a** Notice of a Right to Sue." (Doc. 31, p. 1) (emphasis added). The exhibits incorporated by reference include a copy of one right to sue letter, issued to Plaintiff on September 14, 2021. (Doc. 20-1, p. 7). That right to sue letter concerns EEOC Charge No. 530-2021-02634. *Id.* Plaintiff also alleges that she was "fired on May 13, 2022." (Doc. 31, p. 1). The Court may reasonably infer that the EEOC Charge No. 530-2021-02634 was filed before September 14, 2021 (the date the right to sue letter was issued).

---

[32] We are mindful that courts in the Third Circuit have shown a reluctance to dismiss a complaint at the 12(b)(6) stage when the primary challenge to a hostile work environment claim is whether the conduct in question is severe or pervasive. *Trevizo*, 2024 WL 1195522, at *7; *Fedder v. Bloomsburg Univ. of Pa.*, No. 4:23-CV-1678, 2024 WL 580552, at *3 (M.D. Pa. Feb. 13, 2024). Nonetheless, hostile work environment claims are properly dismissed at the 12(b)(6) stage when the pleading fails to plausibly allege any facts from which it can be inferred that a plaintiff was subject to severe or pervasive harassment. *Trevizo*, 2024 WL 1195522, at *7 (collecting cases).

Defendant argues that, based on this timeline, there is no possibility that Plaintiff's May 2022 termination could have been within the scope of the EEOC's investigation of Charge No. 530-2021-02634, because the investigation concluded more than six months before Plaintiff was terminated. We agree. Based on the facts alleged in this case, it is not plausible that Plaintiff could have administratively exhausted claims related to the termination of her employment before that termination occurred. Therefore, we are compelled to conclude that, although Plaintiff may have exhausted some of her claims when she filed EEOC Charge No. 530-2021-02634, she did not exhaust any Title VII claim related to the May 2022 termination itself. Absent exhaustion, Plaintiff's Title VII claims concerning her May 2022 termination cannot proceed in federal court.

Accordingly, all Title VII claims concerning the termination in May 2022 will be dismissed.

### E.   PLAINTIFF WILL NOT BE GRANTED LEAVE TO AMEND

Last, Defendant argues that Plaintiff should not be granted leave to amend. We agree. If a complaint is subject to dismissal for failure to state a claim, "a district court must permit a curative amendment unless such an amendment would be inequitable or futile."[33] In this case, Plaintiff has had two opportunities to

---

[33] *Phillips*, 515 F.3d at 245.

submit a curative amendment but has not yet set forth a plausible claim. Therefore, we find that permitting further amendment would be futile in this case.[34]

## V.      CONCLUSION

Accordingly, we conclude that Defendant's Motion to Dismiss (Doc. 34) will be GRANTED as follows:

(1)     Plaintiff's Title VII disparate treatment and retaliation claims will be DISMISSED without leave to amend.

(2)     Plaintiff's Title VII retaliatory termination claim will be DISMISSED without leave to amend, but without prejudice to refile as a separate action in the event Plaintiff properly exhausts her administrative remedies.

(3)     An appropriate order will be issued.

Date: June 28, 2024                          BY THE COURT

                                             *s/William I. Arbuckle*
                                             William I. Arbuckle
                                             U.S. Magistrate Judge

---

[34] Plaintiff does not allege whether she has attempted to separately exhaust her retaliatory termination claim with the EEOC. It appears she may be out of time. However, to the extent Plaintiff has separately exhausted her retaliatory termination claim, the dismissal is without leave to amend, but without prejudice to initiating a new civil action once it is properly exhausted.